Case 22-5351, New Albany Main Street Properties v. Watco Companies LLC et al. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good morning. Good morning. May it please the court, Mr. Wicker. My name is Amy Covich and my colleague David Tackaw and I are honored to be here today representing Maria Bouvette, the appellant in this action. With the court's permission, we would like to reserve four minutes for rebuttal. Sounds great. Thank you. In this case, the Port of Louisville seeks a money judgment under state tort law claims against the Louisville and Jefferson County Riverport Authority in federal court based on actions taken by Ms. Bouvette in her capacity as Executive Director. The district court found that Ms. Bouvette's employer, the Riverport Authority, is not entitled to state sovereign or governmental immunity. We believe the district court was incorrect. The Louisville Riverport Authority is clearly within the scope of Kentucky's immunity. Because this case is brought against Ms. Bouvette in her official capacity, we request this court to vacate the denial of her motion to dismiss and remain with instructions. Can I ask, is there a reason that I'm dismissing why you also didn't raise an 11th Amendment federal sovereign immunity claim? Thank you for that question. And, in fact, that was an issue I was going to bring to the court's attention. Are you raising it presently? Well, as the court is probably aware, that is a question I believe that your honors will have to address and whether or not it is deemed to be jurisdictional. Ms. Bouvette, we do not believe, waived that defense below, though it was not addressed in her motion to dismiss and it was not addressed by the district court. However, this court held in Russell v. Lundergan-Grimes that 11th Amendment immunity is jurisdictional and that the court can address that later. In Russell v. Lundergan-Grimes, this particular issue... But isn't it jurisdictional? It's an odd jurisdictional beast because it's the only jurisdictional provision that the state can affirmatively waive. Usually you can't, like diversity, the parties can't waive that, even though it's diverse, not diverse, we want the suit to proceed. Why wouldn't we say that there was at least a waiver for purposes of the current proceedings with the kind of lack of failing to raise it until now? I believe that under... I can think of one case that did find a waiver, and I apologize, I can't remember the exact style of the case, but it was a 2005 case against the Kentucky Department for Workforce Development in which this court did find a waiver. And this was pre-Lundergan-Grimes before it was squarely held this was a jurisdictional issue. But it's not... I think there's a case where when the state removed from state to federal court, that counted as a waiver. So it just proves, as Judge Murphy's saying, it's not traditional subject matter jurisdiction. No, and I agree with that. Why isn't this pretty similar? You're waiting until the argument date at the Sixth Circuit to assert it. I believe that we would say, I don't know that I'm effectively asserting it today. I was prepared to argue it in case the court believed it was jurisdictional. However, I think you get to the same result whether you're applying 11th Amendment law or whether you're applying Kentucky's immunity doctrines, because they end up in the same place. Partly because of your honors discussion in Ohio Execution Protocol litigation. No, I take that back. In Ernst v. Rising, in the Al Bonk case, where the court discussed that you look to the state's sovereign immunity doctrines of whether or not that official is exercising a core state function, which dovetails with the test for sovereign immunity under Kentucky law. So whether you're applying Kentucky's sovereign immunity doctrine or whether you're applying 11th Amendment jurisprudence, it just so happens that Kentucky's sovereign immunity doctrines dovetail. My rough sense is core state function is harder to reach than the Kentucky law as I'm understanding it. Kentucky law seems to extend your clever governmental immunity concept, seems to go a little further. So I don't think they come to the same place, which is fine. It might be easier for you to win than it would be under the 11th Amendment. I think Kentucky, you were right that Kentucky has a rather unique formulation of its sovereign and governmental immunity doctrines. And part of that is because, and I'm sure you saw this in the Comair case and the Bryant case, that Kentucky treats counties as sovereign entities for the same reasons that the 11th Amendment extends immunity to the states. Because in Kentucky, the counties predated the formation of the Commonwealth and entry into the Commonwealth and the Constitution, so they are deemed to have residual immunity. But however, even under that Kentucky formulation, you have to determine whether you are exercising a function integral to state government, which is probably close to the same 11th Amendment test. I switched to Comair in that test. So I think on the face of things, you have a pretty persuasive analogy to Comair. But there are some significant differences, and I wonder if you could talk a little bit about them. One of which is in Comair, it seemed like the airport board was exclusively instituted for airport infrastructure operations. Whereas the Riverport Authority's purpose is a little bit broader. It's not just Riverport facilities, which would be perhaps analogous to the airport. It's also the industrial areas around the Riverport Authority. Would that be a basis to distinguish it? Because I don't know that just pure old industrial development is a traditional government function. Your Honor, we do not believe that is a basis to distinguish that. In addition to Comair, we would point you to the Bryant v. Louisville Metro Housing Authority case, in which the Kentucky Supreme Court unanimously found that the local housing authority had state governmental immunity. In that case, their sole purpose was property development and the provision of housing at low cost. But there they found the government function was, the key point of it, was helping the poor. And obviously you don't have that function here. We don't have that function here, but we have an analogous public purpose of providing transportation infrastructure. Simply because there are other purposes doesn't negate the fact that we meet that core public function. Can I ask just a little bit about what is the industrial development? What is that talking about? Is that transportation related development? Is that like the railroads and other facilities that would pick up the goods shipped on the river? Or is that just other types of industrial development? It varies from river port to river port. The industrial development could be, in this facility in particular, there are railroad ties that come in so that loads that come off barges can then be taken to other facilities. There's warehousing facilities, and then there are private companies that have developed in the area that use the facilities for shipping purposes. So it all ends up becoming an integrated port facility. So it's like a UPS would have a warehouse there, and then they would ship the UPS. Maybe that's a bad example, they usually use air. But a facility that uses the barge would have a warehouse to put their stuff, and that would be the industrial development. That's correct. That's correct. But it's still all tied into the core state function of transportation infrastructure. What are the key items of river traffic these days? Is it farm stuff? A lot of it is fuel. There is, at least in Louisville and Jefferson County, you see a lot of coal, a lot of coal refuse that is going to and from power plants. You also have a lot of metal. There are metal fabricators along the river that ship raw metal that goes up and down the Ohio River. Bourbon? Bourbon part of it? I don't know that bourbon goes by barge. It certainly could. How does it age more? It would, in fact, Your Honor. You know, the test between governmental and proprietary I find very slippery. And the reason I find it slippery is because private business can do just about anything. The Kentucky Supreme Court has said classic examples of government functions are public education. But private education has existed since the founding of this country. So is there really a distinction between those two types of functions that you can deduce from the case law? I believe it's, in the words of the court, why it's a very fact-intensive, not fact-intensive in the sense of unique discovery, but fact-intensive if you have to look at the individual entity and its purposes, and why it can be a difficult analysis. One thing I would point to that the Supreme Court has pointed to multiple times is whether or not it is allowed to have unfettered profits like a private entity or if it is acting in the public interest. In the case of the river port, just like in the airboard in Comair, there are limits on the fees it can impose. They're limited by statute to only those that are reasonable. And if someone is aggrieved by the amount of the fees, they can petition to circuit court and have those fees reduced. And that's exactly like in the airboard case. In addition, the... But how would you distinguish Howard? Do you know the Howard case, the home health care aides? I mean, they found that those entities, those districts, weren't governmental, even though that seems to be helping the elderly stay in their homes. You could qualify that as a government function if it was not-for-profit. I don't believe that those had to be expressly not-for-profit, and I don't believe that there is any history in Kentucky of provision of health care as a core state function in the same way that transportation... I was going to ask, do you think tradition should have a role to play? What historically have been government functions? It appears to under the Kentucky Supreme Court's doctrine in its analysis of whether or not there has historically been that function taken over by the core state function. But what is the history of that port? I mean, ports along the Ohio River, that's been around forever. Was that private or public in the early 1800s and mid-1800s? I believe there's been a mix. Thank you. How did it start? Thank you. Didn't it start private? No, no, I want to hear this. Oh, okay, I thought you were... No, no, I said thank you because, forgive me, I have a bad sense of humor. It was not helpful because you said it was mixed. That's why I said thank you, but it was quite sarcastic. Forgive me. But I actually still want to hear this. How did it start? I mean, I could imagine in the early 1800s it being quite private. Yes, I can't stand here today and claim to have an exhaustive history of river ports in Kentucky. I do know that when the River Port Act was passed, it was with the intention to develop a system of public river ports, and it's in the purpose language, and those, in fact, have been developed along the entirety of the Ohio River. Let's just say, we'll take a look at it, but let's just say the intuition is correct, that for the first 75, 80 years, it really was private. In other words, it was just a bunch of people that decided to raise some money together. They incorporated. They charged fees. It was just very entrepreneurial and very American. If that's true, wouldn't the tradition suggest this is on the proprietary side? I think tradition is not the only factor that we look at. You could say that, though, even in Kentucky, historically, there was a tradition of private roads, and those were later taken over as a state function. The Bryant case instructs that the Kentucky Supreme Court also gives deference to the Kentucky General Assembly's purpose findings, and we have similar public purpose findings in the river port enabling statutes as we do in the air boards and we do in the Housing Authority case. Okay. Thank you very much. We'll get your full rebuttal. Thank you. Mr. Wicker. Good morning. May it please the Court. Kent Wicker for the appellant. Let me start with your question, Judge Sutton, about the tradition of river ports. You are correct that in the past, in the beginning of Kentucky's days, they were all private, and some of them continue to be private today. Many private operators, coal companies, steel manufacturers have their own ports from which they ship their own goods to perhaps customers directly or to river ports such as the one that we're talking about here today. What's the best? I would be very interested if you had a source of authority for this proposition. It's not in the record, Your Honor, so I can't point to something. Is there literature on the topic? Not that I can cite offhand, Your Honor. So this is just your intuition? Well, it's my experience from working with my clients over the past two or three years and getting a sense of how the business operates. To this day, is there a law that bars someone, let's just say I decide to make steel along the river, and I get all the permits, I buy up 1,000 acres two miles along the river, is there a law that prohibits me from distributing my whatever it is, steel, to barges? They do that, Your Honor, including some of our clients. They have their own steel manufacturing plants, and they have a port facility, and they ship it on the river to wherever it's going. It may be transferred to trucks at the river port, or it may go directly to a client. Coal manufacturers or coal. Would state law prohibit me and buy a little more land and then create my own airport for private landing? A private landing, you could probably do that. A commercial airport, you could not. And that's the distinction between this case and the Comair case. I was curious about that, because you could argue, it just could be a level of generality at which you describe the function. If the function is seen as transportation infrastructure, that's what Comair defined it as, I would think that this would fit within that function, and Comair suggested that that would be a governmental function. I think the test is a little different from that, Your Honor. And let me suggest to you what Comair and the cases after Comair have made the test out to be. So if you look at cases after Comair that, for example, a water district, a sewer district, an industrial park, none of those entities are entitled to immunity. A parking garage, a bus service, both coming out of Louisville, are not subject to immunity. The only kinds of things, the only kinds of entities that they have said are subject to immunity are things like the housing authority and the Jefferson County public defender. And the difference there is that those are services that the market will not provide, because they're devoted to poor people who can't afford them. So there's no market, there's no private entity that's able to come in and provide housing services way below markets on a consistent basis. Why wouldn't you say, like the bus case is analogous to what Comair distinguished. Comair didn't say if the government opened an airline that that would be entitled to government functions, and that would be analogous to the bus. I can get around by bus, I can get around by Uber. But it's different, Comair suggested, if it was the underlying infrastructure, the roads, the airports at which planes land, and here the ports at which facilities dock. It seems to me, if you ask me, which this is closer to, it's closer to the airport than it is to like a boat being shipped down the river, that type of transportation. I think it's actually closer to the industrial park kind of analogy. And the Kia Lamb case out of Kentucky and the Snow Pallet case that followed it from this court, in which the courts decided that industrial parks, which build roads, which install utilities, they're certainly building infrastructure, but they're not entitled to immunity. And that's what the courts decided in both of those cases. I think it's important to think about... How did they distinguish Comair? Because they decided, using the words from Comair, that these are not functions integral to government. And the comparison is that private landowners develop their own parcels of land all over the country. It's not... That's what's so slippery about this test. That's correct, but private schools provide education. A lot of private lawyers provide legal services. There's housing services. So then you have to, I guess, I suppose the next step would be, well, then we have to look at the rates that are charged here. It's rate regulation, at least according to the one provision. It has to charge reasonable rates like the airport board suggested the airport has to charge. There is the same provision that says any surplus revenue has to be reinvested in the facilities, and it's not a for-profit entity. So there are a lot of other characteristics, including the public infrastructure, that seem to point the other way. Those are all characteristics of industrial parks as well, Your Honor. So the industrial parks are quasi-public bodies that exist solely to develop the park space and invest in that and not for profit? And promote economic activity in the community. So they have a public purpose as well, but... And their rates are regulated? The rates that they would charge would be rent and land sales. Yeah, and are they regulated? They are not typically regulated, to my knowledge. So does that mean your analogy breaks down? I don't think so, for a couple reasons. One, the rates at which the river port authority sells property or leases land are not regulated. Second point is that in our contract... What is regulated? I thought that's what... I might be confused. I thought that was what was regulated. The statute is talking about shipping rates for customers. That's the shipping rates. So if they want to lease land to a facility to then use the port, that's not regulated? That's not regulated. Or to sell land to a company which wants to put a warehouse on the property. Do they have power of eminent domain? They do, Your Honor, as do industrial parks. Okay, but the only way you have that is it's a public use. The question is not whether it's a public use. Certainly there are things that governments do where they may... And I would have just thought normally that's a pretty good synonym for integral to government, that you have the power of eminent domain. A lot of other entities have eminent domain as well, Your Honor. Industrial parks, water and sewer districts. But the question is whether it's integral to government. And by that, the court means something that is an essential characteristic of government. Something that a government, only a government can do. Eminent domain just strikes me as classic. That can't be the test that only the government can do, because they clearly say education is a public purpose. There is a government function. Well, certainly educating the entire population is something that only the government can do. A private school could, of course, educate certain members of the public, the ones who can pay for it. Just like private lawyers can represent clients who can pay for it. They're not entitled to immunities. But public defenders who represent people who can't pay for it are entitled to immunity. And that's where I think the distinction is. Can the market provide that service? Or does it have to be provided by the government? Well, what about college education? I think, does the University of Kentucky give free admission to those who can't afford it? Obviously, they probably have lots of scholarships, but I suspect that's discretionary. I think we're getting into factual distinctions in the college setting that are a little more fine than I'm able to answer that question, because the costs are everywhere. It just seems to me that they haven't tied the public function of education to the fact that people cannot afford education like they have, or I grant you they absolutely have, for the housing authority. But for education, they just say it's a government function. I suspect maybe the best distinction is the tradition point, that it's always been provided by the government, and maybe that should be the critical inquiry. I think that's certainly an important distinction as well, Your Honor. Another thing that I'd point out as a distinction... It's a distinction point myself that grounds you in something, but it just seems like the integral to government has just evolved in lots of ways over a couple hundred years. I think people in the 1800s would be astonished with what the Commonwealth of Kentucky is doing these days. So that suggests to me that it's not fixed. I think it's not fixed, but it's moving the other direction too. I totally agree with that. You privatize sometimes, and you expand government in other places, and that's what makes me think this is... I mean, I think this is why it's a hard inquiry, but the integral to government is a snapshot in time, and I would think eminent domain is relevant, and some of the other public services points are relevant. Well, what Comair said, Your Honor, with respect to the eminent domain and other portions of the enabling statute, is that the statute is not important, or at least it's not definitive, because the enabling statute here and in Comair said this is a body, corporate and politic, with the right to be sued and be sued. I don't think anything's definitive, so I don't... I hear you on that, I agree with you, but just a bunch of relevant considerations. Yeah, one more consideration is in Comair there was the language. It wasn't identical to the language in this statute, but it did say that the airport board served a governmental function, and the language in this statute suggests that the Riverport authorities are designed for a public purpose, to serve a public necessity. Necessity being a pretty key word, it seems to me, that if there's a public necessity for this, it's the legislature's decision that it's being under-provided by private sources. Well, two points, Your Honor. First, I would suggest that that subsection is related to supporting the right to use the condemnation power, rather than anything else. Say that again? Use the... The condemnation power, rather than anything else. So is the legislature's decision just to support the eminent domain? But they said more than public use, I suppose. They said public necessity as well. And there are a lot of public necessities and public purposes that are well supplied by the private sector. And the question, I think the only way to distinguish the housing authority cases and the industrial park cases and the water and sewer cases is by looking at whether they can be provided by the market. And if they can be provided by the market, then they don't need the protection of sovereign immunity. And I think that's the best way to distinguish them. I do want to make a couple of clarification points, but I'll answer your question. There's no reason you were prepared for the question, so I fully expect you to say, I'm just not sure. My intuition is that federal sovereign immunity is a harder test for the authority to meet here, and that under Kentucky law it's easier. Do you have any instinct or reaction to that point? In other words, they don't strike me as the same inquiries. I think that's right, Your Honor. And I think your assessment is correct. But this point was not raised. The point is waived, yeah. I'm just switching gears briefly, too. I forgot to mention the other side. So why, it seems to me in your brief, at least on appeal, you're making the claim that you have sued Bouvet in her individual capacity, and that would clearly eliminate any right to governmental immunity. Suppose we thought that your complaint doesn't say anything about this. I think the presumption is usually it's official capacity. Is this all just like a pleading exercise? Is there any reason why you couldn't go back down and plead an individual capacity claim in an amended complaint? No, Your Honor. That's exactly what we would do, and subject to the discretion of the district court, it may be granted. Would there be any impediments to that? Would it be like a statute of limitations issue? It's not a statute of limitations issue, Your Honor. It's a matter of discretion with regard to what else has happened in the court. And in this case, there's been no substantial discovery, no depositions taken. Yeah, so I'll give you your best shot at why you think you pleaded an individual capacity claim. Usually, I think the case law suggests it should be in the complaint itself, but I didn't see that anywhere in the complaint. In retrospect, Your Honor, I think it should have been a lot more apparent, and we would seek amendment in the district court. But was that your intent all along? It was my intent, Judge. I just want to clarify my answer to Judge Larson's question about rates. Of course, there is the statutory provision that the court has referenced, but in our contract, our lease with the Riverport Authority, the lease gives my client the right to set rates, and it has throughout the term of the lease. And then those rates aren't regulated because of the contractual relationship? No one has ever challenged that point in a Kentucky court, certainly not with regard to this client and this Riverport. So it would be my position that we have the contractual right to set the rates. Okay. Subject to the market. Thank you so much. Getting back to Judge Murphy's question about education and the Chief Judge's question about the slipperiness of the Kentucky test and whether tradition is a factor here. It's truly not solely tradition, as you noticed yourself, Chief Judge. The public purpose or the traditional functions of government have changed over time. What the Kentucky Supreme Court looks at is what is at this point in time under the statutory scheme that the General Assembly has set up, whether or not it is a governmental function. For instance, for education. Our Kentucky Constitution as well as Kentucky statutes declare that it is a governmental function, notwithstanding the fact that the private market does in fact provide education to people. And on the fact of the distinction of the market and whether the market can or cannot provide, though I understand why counsel wants to assert that distinction, that does not appear in the Kentucky Supreme Court's analysis. How would you distinguish the sewer and water cases? Well, the recent sewer and water case, the 2015 case, is an interesting beast because it actually first goes off on the first part of the test of whether or not it was created by an immune entity. And there the court found that it actually was not created by either a state or a county. It was created essentially through a ballot initiative that was from the ground up. And the members of the property areas in which the sewer and water district was going to, where that was going to serve, they voted that they would be financially responsible. So therefore, it wasn't created by the county, it wasn't controlled by the county, and it failed under the first part. There is language in that then discussing the second prong of the test and does say that sewer and water is not a core state function, partly because statutory findings and the water and sewer statutes for the state don't deem it a state function. They do discuss it in terms of locality and none of the statutes cited have the same kind of public purpose and public necessity language. Most public utilities have traditionally been private. There's a mix in Kentucky. We have quite a few public utilities that are private. Our biggest public utilities on both the water and sewer side are private utilities that are regulated by the Public Service Commission. And then we have municipal utilities that are not regulated because they are municipally owned. I don't know if that answers your question. And by municipally owned, do you mean by cities? By cities. They would fall totally outside, right? Isn't anything owned by a city just outside sovereign immunity? That's correct, Your Honor. So they would lack that immunity. In summary, I see that I have less than a minute left. If there are no more questions, we do want to point the court to the Ian Bailey case which did say as a constitutional matter that publicly owned river ports are in fact public facilities even if there are private competitors and the public has to be given access to those through competitive bidding. So that is a different constitutional provision than ones we would be looking at for sovereign immunity though that's not truly in the Constitution. It's more implied. It is, I think, instructive for the Kentucky Supreme Court and this Court. And in summary, we would ask that this Court vacate the denial of the motion to dismiss of the District Court and send it down with instructions to dismiss. Thank you. Thank you, Ms. Cubbage. Thank you, Mr. Wicker. This is such a tricky case and I'm so grateful we have good lawyers who know something about Kentucky law and Kentucky history. So thank you very much. We really appreciate it. Case will be submitted and the clerk may call the last case.